IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

LAURIE L. SHIFFLETT,

       Plaintiff,

v.
                                      Civil Action No. 1:08cv136
                                      (The Honorable Irene M. Keeley)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant," and sometimes"Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.[1]

## I. Procedural History

Laurie L. Shifflett ("Plaintiff") filed an application for DIB on June 26, 2003; an application for SSI on June 26, 2003; an application for DIB on February 17, 2004, alleging disability due to

---

[1]Plaintiff filed her Motion for Summary Judgment with attached Memorandum in Support of Motion for Summary Judgment. Plaintiff's memorandum was twenty-two pages in length. Plaintiff did not seek, by filing a motion, the Court's permission to exceed the fifteen-page page limit as provided in L.R. Gen. P. 86.02(e). The Court accepts the filed Memorandum in Support of Motion for Summary Judgment in the instant case but admonishes counsel for Plaintiff for not abiding by the established Local Rules and instructs him to do so in future filings.

COPD, asthma, epilepsy, affective disorders, attention deficit hyperactivity disorder, and chronic pain syndrome (R. 69-72, 65-68, 332-34, 340). Plaintiff's applications were denied initially and upon reconsideration (R. 29-31, 340). Plaintiff filed a timely request for a hearing by an administrative law judge (R. 53). Jay Robert Brown, an Administrative Law Judge ("ALJ") conducted a hearing on June 8, 2006, at which Plaintiff, represented by David Furrer, Esquire, and K. Van Dyke, a Vocational Expert ("VE") testified (R. 350-72). On August 26, 2006, the ALJ issued a decision finding Plaintiff could perform her past relevant work (light) and was, therefore, not disabled (R. 18-27). On May 7, 2008, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 7-9).

The undersigned must, at this point, address a document which was filed by Plaintiff. A time line of the required pleadings in this case is as follows:

- Plaintiff filed her complaint on July 8, 2008 [Docket Entry 2].

- The summonses were executed on the United States Attorney for the Northern District of West Virginia on July 21, 2008, and on General Counsel of the United States Department of Justice on July 22, 2008 [Docket Entry 4].

- On September 9, 2008, the Defendant filed his answer [Docket Entry 5].

- The Social Security administrative record relative to this case was filed on September 11, 2008 [Docket Entry 11].

- Plaintiff filed her Motion for Summary Judgment and supporting brief on October 7, 2008 [Docket Entry 10].

- On November 6, 2008, Defendant filed his Motion for Summary Judgment and supporting brief [Docket Entries 11 and 12].

On April 16, 2009, more than five months after the Defendant's motion and brief were filed, Plaintiff filed a copy of an April 10, 2009, decision by ALJ William B. Lissner, which was fully favorable to Plaintiff. Attached to this April 10, 2009, decision was a "List of Exhibits," which may

be a listing of the evidence contained in the administrative record of the claim that was before ALJ Lissner (Docket Entry 15, at pp. 14-18). In the April 10, 2009, decision, ALJ Lissner found Plaintiff had been disabled since August, 2006, the date ALJ Brown issued his unfavorable decision in this case. Plaintiff did not seek leave of the Court to file this document. Plaintiff did not submit any accompanying document to explain her reasons for electronically filing the decision by ALJ Lissner; Plaintiff did not submit any motion relative to this filing. Because there was no accompanying document or motion filed by Plaintiff with ALJ Lissner's decision, the undersigned is unsure as to the intended purpose of Plaintiff's filing it and does not know what relief the Plaintiff seeks, if any; nonetheless, the undersigned makes the following findings.

L.R. Gen. P. 86.02 establishes the procedures to be followed in filing pleadings in Social Security Appeal cases in this District L.R. Gen. P. 86.02(b) mandates that a defendant shall file an answer to a complaint and the administrative record applicable thereto within sixty days of the date of service of the complaint. L.R. Gen. P. 86.02(c) mandates that the plaintiff shall file a "brief in support of his or her claim(s) for relief" within thirty days after the defendant has filed an answer and the administrative record. L.R. Gen. P. 86.02(d) mandates that defendant's brief shall be filed within thirty days of the filing of plaintiff's brief. (The above L.R.Gen. P. references are numbered differently within this document than they were numbered when this case was instituted. The Local Rules were revised in April, 2009, and the Rule numbers were altered as a result of the revisions.)

Defendant filed a Response to Plaintiff's Submission of Additional Evidence on April 30, 2009 [Docket Entry 16]. As Defendant asserted, L.R. Gen. P. 86.02(e) mandates that the "case shall be deemed submitted as of the date on which the defendant's reply brief is filed." Defendant also asserts that, if it was Plaintiff's intention to submit ALJ Lissner's decision as newly discovered

evidence to this Court, she did not satisfy all the requirements mandated in *Borders v. Heckler*, 777

F.2d 954, 955 (1985), which reads as follows:

> A reviewing court may remand a Social Security case to the Secretary on the basis
> of newly discovered evidence if four prerequisites are met. The evidence must be
> "relevant to the determination of disability at the time the application was first filed
> and not merely cumulative." *Mitchell v. Schweiker,* 699 F.2d 185, 188 (4th Cir.1983).
> It must be material to the extent that the Secretary's decision "might reasonably have
> been different" had the new evidence been before her. *King v. Califano,* 599 F.2d
> 597, 599 (4th Cir.1979); *Sims v. Harris,* 631 F.2d 26, 28 (4th Cir.1980). There must
> be good cause for the claimant's failure to submit the evidence when the claim was
> before the Secretary, 42 U.S.C. § 405(g), and the claimant must present to the
> remanding court "at least a general showing of the nature" of the new evidence. *King,*
> 599 F.2d at 599.

Defendant goes on to argue that "an award of benefits under a subsequent application, for a

different period, on a different record, by a different adjudicator, is new and material evidence upon

which the Court should remand this case is without merit." Defendant also asserts an "application

for benefits remains in effect until the date of the ALJ's decision relative to that application. See 20

C.F.R. §404.620" and that "'SSA treats a claimant's second or successive application for disability

benefits as a claim apart from those earlier filed, at least to the extend that the most recent

application alleges a previously adjudicated period of disability'"(Defendant's brief at p. 3).

Defendant further argues that "[e]xtra-record evidence must at least relate to the relevant time period

in order to be 'material.' *Wilkins v. Sec'y of Health and Human Serv.*, 953 F.2d 93, 95-96 (4th Cir.

1991)(en banc)." Additionally, Defendant asserts there was "not good cause for Plaintiff's failure

to submit the underlying evidence to the Court when she filed her motion for summary judgment"

in the instant case (Defendant's brief at p. 4).

The undersigned agrees with the assertions and arguments of Defendant. This case was

briefed and ready for decision on November 6, 2008, when Defendant filed his brief and supporting

memorandum. There is certainly no provision in the Local Rules of General Procedure that allows a party to file a document five months after the filing deadline. Additionally, Plaintiff's application, which resulted in the April 10, 2009, decision of ALJ Lissner, was a successive application to the one that gave rise to the instant case and is, therefore, separate and apart. Furthermore, ALJ Lissner made it quite clear in his decision that the evidence on which he relied in awarding benefits to Plaintiff was "new medical records" and "more current medical records" than were available to and considered by the "previous Administrative Law Judge" (Docket Entry 15 at pp. 8 and 9]. ALJ Lissner also found that Plaintiff's residual functional capacity had been "reduced . . . since the last decision" (Docket Entry 15 at p. 12). As to Plaintiff's failure to submit additional evidence to the Court when she filed her motion for summary judgment in this case, the undersigned finds that good cause has not been shown. If the evidence were available during the pendency of the claim addressed herein, the Plaintiff had opportunities to submit it to the Social Security Administration; the administrative law judge who conducted a hearing on the claim on June 8, 2006, and issued an decision on August 26, 2006; or to the Appeals Council. The decision by ALJ Lissner refers, in part, to evidence from June, 2007; July, 2007; August 2007; and April, 2008 (Docket Entry 15 at p. 11). These records were created one-to-two years after the decision was rendered in the instant case.[2] They are immaterial because they are not of the relevant time period. The undersigned further finds

---

[2]The above referenced "List of Exhibits" contains the dates of disability determinations, medical records, non-disability development records, and disability-related development records, which dates range from April, 2007, though December, 2008. There was a medical record from Dr. Swope, which was dated September 27, 2006, and which was provided to the Appeals Council relative to the claim in the instant case [Docket Entry 15 at p. 1; R. 6]. Additionally, portions of records from Dr. Omundsen, dated from June 16, 2003, (to April 27, 2007,) and March 28, 2005, (to August 21, 2007,) may have been included in the record currently before this Court [Docket Entry 15 at p. 17].

that the evidence still has not been produced because the recitation of some of the specifics of some of the evidence by ALJ Lissner in his April, 2009, decision, which was based on a subsequent application by Plaintiff and which was submitted by Plaintiff after the filing deadline closed in this case, is not evidence to be considered by this Court.

Because Document Entry 15, a copy of a fully favorable decision by an ALJ who conducted a hearing on a subsequent application made by Plaintiff, was not filed in accord with any Local Rule of this District and did not comply with the above cited case law, the undersigned rejects it.

## II. Statement of Facts

Plaintiff was fifty-one years old at the time of the administrative hearing (R. 354). Plaintiff had obtained an A.A. degree (R. 354). Plaintiff's past relevant work included manager of a clothing store and retail sales (R. 356-57).

On June 16, 2003, Plaintiff presented to Dr. Omundsen, a physician with the Amherst Family Practice, and informed the doctor that she was pursuing disability due to seizures, asthma, chronic arthritis, and chronic pain. Plaintiff reported her sleep was interrupted by pain and she slept during the day. Plaintiff reported she was depressed. Plaintiff informed Dr. Omundsen she could not "do a lot of things." Plaintiff stated her back had "been bothering her" and it felt "swollen from time to time." Plaintiff stated her father had been diagnosed with lymphoma and it took the form of a mass on his back. Plaintiff reported she could sometimes locate a mass and sometimes she could not. Plaintiff stated she felt "electric shocks running down her legs and fingers" and constant tingling in her hands and feet. Plaintiff reported the tingling was worse when her back hurt. Plaintiff medicated with Carbatrol; she did not take any other medications because she could not afford the costs of them. Dr. Omundsen found Plaintiff to be "tearful" and "upset" during the examination. Plaintiff

stated she was "just tired of all her problems" and had "barely been making ends meet since her unemployment insurance ran out." Plaintiff reported she had applied for one-hundred and fifty jobs during the past year and had not been employed. Upon examination, Dr. Omundsen found Plaintiff's lungs were clear, and her heart was normal. There were no swellings or deformities located at her back. Dr. Omundsen found Plaintiff was positive for "some palpable spasm and tenderness in the lumbar area extending over to the right SI joint." Her straight leg raising test was negative; her distal pulses were strong. Plaintiff's sensation was intact. She had "exquisite tenderness at the MP joints of her hands particularly at the thumb." Dr. Omundsen opined Plaintiff's MP joint tenderness "greatly reduce[d] her mobility and her ability to do repetitive tasks and gripping things." Dr. Omundsen diagnosed Plaintiff with "asthma, seizures, paresthesias, insomnia, and chronic pain issues." Dr. Omundsen prescribed Pamelor and Carbatrol. She instructed Plaintiff to return to her care as needed (R. 316).

On September 6, 2003, Harry Hood, M.S., completed a Disability Determination Evaluation of Plaintiff (R. 215). Plaintiff reported she was applying for disability because she had epilepsy, arthritis, "CRM" with chronic pain, and depression. Plaintiff reported "sleep disturbances due to medications, inability to lift due to pain, anger at inability to do different activities causing her to be unpleasant at work, and seizures that caused pain in her neck." Plaintiff's presenting symptoms were "seizure disorder due to head injuries in the early 1970s from a fall from a horse"; chronic pain "due to CRM in her hands and wrists[;] history of back injury falling from horses"; depression; low energy; "sleep disturbances with oversleeping or lack of sleep"; "feeling of low self-worth due to failing"; occasional crying; and a good future outlook (R. 216).

Plaintiff reported she had not experienced a seizure since 1980. She informed Mr. Hood that

she had had four surgeries on her right wrist and one surgery on her left wrist. Plaintiff reported medicating with Carbatrol 300mg (R. 217). Plaintiff was self-employed at the time of the evaluation. She sold air purifiers. She reported her past employment history included managing two retail stores and serving as assistant manager of another. Between 1996 and 2001, Plaintiff was assistant manager of National Wildlife Foundation. She informed Mr. Hood that she had resigned her employment there, but Mr. Hood noted Plaintiff had been terminated due to not following directions (R. 217). Plaintiff's Verbal IQ was listed as 105; her Performance IQ was 99; her Full Scale IQ was 103; her Verbal Conceptualization Index was listed at 107; her Perceptual Organization Index was 107 (R. 217-18). On the WRAT 3, Plaintiff scored at the post high school level on reading; high school level in spelling; and seventh grade in arithmetic (R. 218).

On the mental status examination part of the evaluation, the following was found: Plaintiff was moderately overweight; no mobility impairment was observed; Plaintiff was cooperative and her speech was relevant and coherent; she was oriented, time four; her mood was normal and her affect was broad; Plaintiff's thought process and thought content were normal; she had no suicidal ideations, homicidal ideations, illusions or hallucinations; Plaintiff's insight was fair; her judgment was average; Plaintiff's immediate and remote memories were within normal limits, but her recent memory was moderately deficient; Plaintiff's psychomotor behavior was within normal limits; and her concentration, persistence, and pace were all normal (R. 219). Plaintiff's prognosis was fair; Mr. Hood found she could manage her own finances (R. 221).

Mr. Hood opined Plaintiff's social functioning was within normal limits during the examination. Plaintiff's activities of daily living were as follows: rose at 8:00 a.m.; watched television; thought "about what she [was] going to do as far as her business" that date; went to sleep.

Plaintiff stated she retired at either 10:00 p.m. or 11:00 p.m. and awoke at 1:00 a.m. due to "pain and disturbed sleep." Plaintiff reported she occasionally attended church, maintained relationships with friends, got along well with most people, frequented restaurants, and went to movies. Plaintiff informed Mr. Hood that she had to "force herself to do activities." She stated she "require[d] structure through her day to maintain effort." Plaintiff stated she experienced "low energy" and that she "[tried ... to become interested in her business and to set up appointments." Plaintiff reported she performed household chores, cooked, did the laundry, grocery shopped, and made sales contacts. Plaintiff listed ceramics as her hobby (R. 220).

Plaintiff's subjective complaints were for seizure disorder, controlled with medication, chronic pain, and depression. Mr. Hood diagnosed depressive disorder NOS (Axis I) and "seizure disorder and chronic pain per claimant and medications" (Axis III). Mr. Hood's rationale for his diagnosis of depressive disorder was based on Plaintiff's report of frequent depressive symptoms, including low energy, depressed mood, low self-worth, sleep disturbances, good future outlook, and no suicidal or homicidal thoughts. Mr. Hood noted that it was "uncertain whether the disorder [was] directly related to [Plaintiff's] physical impairments or endogenous in nature, however, appears to be a factor in her daily ability to function" (R. 220).

On September 10, 2003, Frank Roman, Ed.D., completed a Psychiatric Review Technique of Plaintiff. Mr. Roman found Plaintiff had an impairment, affective disorder, that was not severe (R. 222). Plaintiff's affective disorder was listed as "Depression D/O" (R. 225). Mr. Roman found Plaintiff had no restrictions of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, and/or pace. Mr. Roman found Plaintiff had had no episodes of decompensation (R. 232).

On September 24, 2003, Plaintiff underwent a pulmonary function test. It showed possible early obstructive pulmonary impairment due to the reduced FEF. The FVC was normal. The finding could be due to a "mild degree of small airway disease and/or either asthma or the earliest stages of emphysema." The test showed the obstructive impairment could be "reversible in nature." A follow-up test was recommended (R. 243).

On September 24, 2003, Plaintiff had a chest x-ray made. It was normal (R. 247).

On September 30, 2003, B. J. Kerbyson, D.O., completed an internal medicine examination of Plaintiff. He reviewed no records in conjunction with the examination. Plaintiff reported she experienced seizures since 1979, described the seizures as grand mal type, and stated her last seizure was in 1980. Plaintiff medicated this condition with Tegretol. Plaintiff also reported she experienced depression and asthma (R. 236). Plaintiff reported she had had carpal tunnel release on each wrist and tendon surgery on her right hand. Plaintiff stated she did not experience "nausea, vomiting, abdominal pain, changes in bowel habits, melena, hematochezia, hematemesis, hemoptysis, urgency, frequency, dysuria, or hesitancy." Plaintiff was five feet, six inches tall and weighed 190 pounds. Dr. Kerbyson found Plaintiff's gait was normal; she did not require use of an assistive device to walk; she was stable at station and comfortable in the supine and sitting positions; her "[i]ntellectual functioning appear[ed] normal during the examination"; her recent and remote memories were good; Plaintiff was wearing wrist splints (R. 237).

Dr. Kerbyson's examination of Plaintiff's HEENT, neck, chest, cardiovascular system, abdomen, and upper and lower extremities showed normal results (R. 237-38). Plaintiff's hands revealed tenderness at the MCC joint. Plaintiff could make a fist, write her name, button and pick up coins with either hand without difficulty. Her grip strength was normal. Plaintiff's cervical spine

10

was normal. Plaintiff's dorsolumbar spine showed no spasms, no tenderness, no hip joint tenderness, and no redness, warmth, swelling, or crepitus. Plaintiff's straight leg raising test, in both the sitting and supine positions, was normal. Plaintiff could stand on one leg without difficulty (R. 238). Dr. Kerbyson's neurological examination of Plaintiff revealed that her cranial nerves were intact; her muscle strength and tone were normal in both upper and lower extremities; there was no atrophy; her sensory modalities (light touch, pinprick and vibration) were well preserved; all reflexes were symmetrical and graded normally; Plaintiff's Hoffman and Babinski's signs were negative; she had no clonus. Plaintiff could walk on her heels and toes; she could perform tandem gait; she could squat without difficulty (R. 239).

Dr. Kerbyson's impressions were for moderate obesity, osteoarthritis of the right wrist, history of seizure disorder, history of asthma, and history of depression. Dr. Kerbyson found Plaintiff had no shortness of breath and her pulmonary examination was normal (R. 239).

On October 14, 2003, Fulvio R. Franyutti, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff (R. 248, 255). Dr. Franyutti found Plaintiff had no exertional limitations (R. 249). Dr. Franyutti opined Plaintiff should never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs. Dr. Franyutti found Plaintiff could frequently balance, stoop, kneel, crouch, and crawl (R. 250). Dr. Franyutti found Plaintiff had no manipulative, visual, or communicative limitations (R. 251-52). Dr. Franyutti opined Plaintiff should avoid concentrated exposure to extreme cold, fumes, dusts, odors, gases, poor ventilation, and hazards. Dr. Franyutti found Plaintiff should avoid all exposure to machinery and heights. Dr. Franyutti found Plaintiff had no limitations regarding extreme heat, wetness, humidity, noise, vibration (R. 252). In making his determinations, Dr. Franyutti reviewed Dr. Kerbyson's findings,

Plaintiff's pulmonary function test, and chest x-ray of September 23, 2003 (R. 255).

On January 2, 2004, Plaintiff returned to Dr. Omundsen with complaints of not feeling well and fatigue from the medications (Nortriptyline and Carbatrol). Plaintiff reported "she was having intolerable side effects to the Nortriptyline." Those side effects included "dry mouth, drowsiness, dizziness, heartburn, mood swings, irritability, ringing in her ears, stiffness, and uncontrollable road rage." Plaintiff reported being "irritated all the time." Plaintiff stated she stopped taking the medication and experienced "intolerable joint pain and disability form her seizures, her fatigue, and her joint pain." Plaintiff informed Dr. Omundsen her nephew had been diagnosed with autism and she had "read an article on ADHD and realized that she ha[d] a lot of the same symptoms as were listed in the article." Plaintiff stated her most severe conditions were fatigue and hypersomnolence. Plaintiff reported she fell asleep "automatically" if she sat down. Plaintiff complained of "bad upper respiratory symptoms with swollen glands and low grade fever." Plaintiff stated she experienced "a lot of pain in her hips and her legs." Upon examination, Dr. Omundsen found Plaintiff was positive for tender sinuses, post nasal drainage, tender adenopathy, and few and scattered lung wheezes. Plaintiff was also positive for tenderness of the MP joint of her left thumb and hips. Dr. Omundsen diagnosed sinusitis, fatigue, seizures, and joint pain and prescribed Amoxil and Strattera (R. 317).

On February 5, 2004, Dr. Omundsen completed a Physical Residual Functional Capacity Questionnaire of Plaintiff. Dr. Omundsen noted that she had treated Plaintiff since 1999 and that she examined Plaintiff two or three times monthly until Plaintiff lost her insurance coverage. Dr. Omundsen wrote that Plaintiff's diagnoses were for duodenal ulcer, seizures, allergic rhinitis, asthma, fatigue, joint pain, hypersomnolence, and fibrocystic breasts. Dr. Omundsen opined that Plaintiff's prognosis was fair because "all [Plaintiff's] problems [were] chronic with little

improvement anticipated." Dr. Omundsen noted that Plaintiff's symptoms were for joint pain in her "hands, back, ankles, feet." Dr. Omundsen opined Plaintiff could not stand for long periods of time and could not do repetitive movements with her hands. Other symptoms were paresthesias, fatigue, irritability, dry mouth, headaches, shortness of breath, swelling of her ankles, muscle spasms, confusion and depression. Dr. Omundsen described Plaintiff's pain as sharp, at a level of six or eight on a scale of one-to-ten, daily, and worse with movement or prolonged standing. Dr. Omundsen noted Plaintiff wore splints to treat her arm/hand/wrist pain; wore orthotics in her shoes to treat foot pain from fallen arches and paresthesias; and had low endurance from fatigue (R. 256).

The clinical findings and objective signs on which Dr. Omundsen relied were "swelling/pain" in "joints in hands, wrists. [T]enderness, hip tenderness. Seizure medicine contributing to fatigue. Asthma/wheezing contribute to low endurance." Dr. Omundsen noted Plaintiff experienced headaches, shortness of breath, "edema, paresthesias, spasms, confusion, depression, fatigue, and dry mouth" due to her use of Carbamazepine and that Plaintiff was intolerant of Pamelor. Dr. Omundsen opined Plaintiff's conditions would last at least twelve months (R. 256).

Dr. Omundsen found Plaintiff was not a malingerer and that she experienced depression due to chronic pain. Dr. Omundsen wrote that Plaintiff's impairments were reasonably consistent with her symptoms and functional limitations. Dr. Omundsen opined that Plaintiff's pain would cause frequent interference with her attention and concentration. Dr. Omundsen opined Plaintiff was capable of low-stress jobs and elaborated by writing that Plaintiff could "tolerate low stress emotionally but physical limitations hamper ability to work" (R. 257).

Dr. Omundsen found Plaintiff could walk one city block without rest or severe pain. She opined Plaintiff could sit for fifteen minutes at one time before she needed to get up and could stand

for fifteen minutes at one time before she needed to sit down or walk around (R. 257). Dr. Omundsen found Plaintiff could sit and stand/walk for about two hours in an eight-hour workday. She opined Plaintiff would need to walk around every fifteen minutes for four minutes at a time during an eight-hour workday. Dr. Omundsen found Plaintiff needed a job that permitted at will position changes. She wrote that Plaintiff would have to take unscheduled breaks, two to three times per day, for ten to fifteen minutes per break. Dr. Omundsen opined that Plaintiff's legs should be elevated to six-to-ten inches if she sat for a prolonged period of time and fifty percent of the time if Plaintiff's job was sedentary (R. 258).

Dr. Omundsen found Plaintiff could never lift fifty pounds, rarely lift twenty pounds, and occasionally lift ten pounds or less (R. 258). She opined Plaintiff could never climb ladders, could rarely crouch or climb stairs, and could occasionally twist and/or stoop. Dr. Omundsen found Plaintiff had significant limitations in performing repetitive reaching, handling, or fingering. She opined Plaintiff could grasp, turn, and twist objects with both hands ten percent of an eight-hour workday; could perform fine manipulation with her fingers on both hands for ten percent of an eight-hour workday; and could reach (including overhead reaching) for ten percent of an eight-hour workday (R. 259).

Dr. Omundsen opined that Plaintiff would have "good" days and "bad" days. She also opined Plaintiff would be absent for more than four days per month from her job due to impairments or treatments therefor. Dr. Omundsen opined that repetitive motions aggravated Plaintiff's hand pain and parenthesias; standing aggravated her "back, hip, knees." Depression was caused by chronic pain and affected her "ability to work in any capacity." Dust and chemical exposures exacerbated Plaintiff's asthma (R. 259).

On April 13, 2004, Dr. Franyutti completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff had no exertional limitations (R. 265). Dr. Franyutti opined Plaintiff could never climb ladders, ropes, or scaffolds, but she could occasionally climb ramps or stairs. Dr. Franyutti found Plaintiff could frequently balance, stoop, kneel, crouch, and crawl (R. 266). Dr. Franyutti opined Plaintiff had no visual, manipulative, or communicative limitations (R. 267-68). Dr. Franyutti found Plaintiff's exposure to extreme cold or heat, wetness, humidity, noise, vibrations, fumes, odors, dusts, gases, and poor ventilation was unlimited. He found she should avoid all exposure to hazards (R. 278). Dr. Franyutti noted that his RFC was based on Plaintiff's pain, fatigue and seizures, which were in remission (R. 269). Dr. Franyutti noted Plaintiff had a normal gait, tenderness in her thumb and "MCC joint," normal grip strength, normal ranges of motion, normal pulmonary function, and no active seizures as the last one was in 1980 (R. 271).

On April 15, 2004, Dr. Gustin of Amherst Family Practice, saw Plaintiff for dental pain. Plaintiff reported she had an appointment at the free clinic to have a tooth repaired, but the dentist with whom she had the appointment was no longer at the free clinic and she had to wait for two months for care. She had been given a prescription for Pen-VK 250 and was seeking additional amounts of that medication to treat the pain until she was treated at the free dental clinic. Dr. Gustin prescribed Pen-VK 500, one to be taken four times per day for ten days, to Plaintiff (R. 318).

On April 19, 2004, Joseph Kuznair, Ed.D., completed a Mental Residual Functional Capacity Assessment of Plaintiff. Mr. Kuznair found Plaintiff was not limited in her abilities to remember locations and work-like procedures or understand and remember detailed instructions. Plaintiff presented no limitation in her ability to understand and remember very short and simple instructions (R. 272). Mr. Kuznair found Plaintiff was not significantly limited in her ability to carry out detailed

instructions or her ability to work in coordination with or proximity to others without being distracted by them. Mr. Kuznair found Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods of time; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (R. 272-73). Mr. Kuznair found Plaintiff had no evidence of limitation of her ability to carry out very short and simple instructions, ability to sustain an ordinary routine without special supervision, and ability to make simple work-related decisions (R. 272). Mr. Kuznair found Plaintiff was not significantly limited in her ability to interact appropriately with the general public or to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Mr. Kuznair found Plaintiff demonstrated no evidence of any limitation in her ability to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness. Mr. Kuznair found Plaintiff was not significantly limited in her ability to respond appropriately to changes in the work setting or her ability to set realistic goals or make plans independently of others. Mr. Kuznair found Plaintiff presented no evidence of any limitation to her ability to be aware of normal hazards and take appropriate precautions or to travel in unfamiliar places or use public transportation (R. 273).

Mr. Kuznair noted Plaintiff retained the "capacity to understand . . . somewhat complex instructions" but had difficulty with her memory and coping skills. Mr. Kuznair opined Plaintiff "retain[ed] the capacity to remember and carry out at least 1-3step routine instructions" and could

"manage a moderate level of social interaction demand work setting" (R. 274).

Also on April 19, 2004, Mr. Kuznair completed a Psychiatric Review Technique of Plaintiff. He noted Plaintiff was positive for affective disorder and organic mental disorder (R. 276). Dr. Kuznair found Plaintiff's organic mental disorder to be ADHD (R. 277). Plaintiff's affective disorder, according to Mr. Kuznair, was depression (R. 279). Mr. Kuznair found Plaintiff had no restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. He found Plaintiff had experienced no episodes of decompensation (R. 286). Mr. Kuznair noted Plaintiff alleged seizures, pain in her hands and back, neuropathy, headaches, asthma, and ADHD. Mr. Kuznair reviewed Mr. Hood's September 6, 2003, findings that Plaintiff's Verbal IQ was 105, her Performance IQ was 99, and her Full Scale IQ was 103. Mr. Kuznair noted Mr. Hood found Plaintiff had depression, NOS, and no diagnoses for Axis II. Mr. Kuznair also considered Dr. Omundsen's January 2, 2004, opinion that Plaintiff had side effects from Nortriptyline and would treat ADHD with Strattera. He considered Dr. Omundsen's February 5, 2004, opinion that Plaintiff's RFC was based on her depression and fatigue, that Plaintiff could emotionally tolerate low stress jobs, and depression from chronic pain would affect Plaintiff's ability to work (R. 288).

On July 13, 2004, Thomas Lauderman, D.O., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and unlimited push/pull (R. 291). He considered medical reports from June, 2003, and September, 2003, January, 2004, and February 2004 (R. 291-92). Dr. Lauderman found Plaintiff had no postural,

visual, manipulative, communicative, or environmental limitations (R. 292-94). Dr. Lauderman noted Plaintiff medicated with Carbatrol and Ibuprofen and that she'd not experienced a seizure since 1980. Dr. Lauderman noted Plaintiff's ADL's were as follows: Plaintiff completed all her own household chores with no assistance; she shopped; she painted and sewed as hobbies; and she attended college. He noted Plaintiff's sleep and meal preparation were reduced two degrees due to pain. Dr. Lauderman opined that Plaintiff had "observable limitations [that were] . . . consistent [with] the minor ADL decreases reported" and that Plaintiff's complaints of pain were "highly exaggerated in light of minimal physical findings so [Plaintiff] is deemed [less than] fully credible" (R. 295). Dr. Lauderman noted that Dr. Omundsen's February 5, 2004, findings that Plaintiff could walk one city block before she needed to stop and rest, could sit/stand only fifteen minutes at one time, could sit/stand for a total of two hours in an eight-hour workday, had to walk for four minutes every fifteen minutes, had to shift positions at will, had to take two or three unscheduled breaks each day, could rarely lift/carry twenty pounds and occasionally ten pounds, could never climb ladders, could never crouch, and could never climb stairs were significantly different than his findings. Dr. Lauderman further noted he disagreed with Dr. Omundsen's February 5, 2004, findings because Plaintiff attended college five times per week, did all of her household chores, and had not had a seizure since 1980. He opined "credibility is a major issue in this case." He reduced Plaintiff's RFC to medium (R. 296).

On August 23, 2004, Mr. Roman completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff's organic mental disorder was ADHD (R. 298-99). She had an affective disorder, which was listed as "depression DO" (R. 298, 301). Mr. Roman found Plaintiff had mild limitations of her ability to perform activities of daily living and ability to maintain concentration, persistence,

or pace. Mr. Roman found Plaintiff had moderate limitations of her ability to maintain social functioning. He noted Plaintiff had never experienced any episodes of decompensation (R. 308).

Also on August 23, 2004, Mr. Roman completed a Mental Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff's abilities were not significantly limited in the following areas: 1) to remember locations and work-like procedures; 2) to understand, remember and carry out very short and simple instructions; 3) to understand and remember detailed instructions; 4) to sustain an ordinary routine without special supervision; 5) to work in coordination with or proximity to others without being distracted by them; 6) to make simple work-related decisions; 7) to interact appropriately with the general public; 8) to ask simple questions or request assistance; 9) to respond appropriately to changes in the work setting; 10) to be aware of normal hazards and take appropriate precautions; 11) to travel in unfamiliar places or use public transportation; and 12) to set realistic goals or make plans independently of others. Mr. Roman found Plaintiff to be moderately limited in her ability to perform the following: 1) carry out detailed instructions; 2) maintain attention and concentration for extended periods; 3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and 4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Mr. Roman found there was no evidence that Plaintiff was limited in the following abilities: 1) accept instructions and respond appropriately to criticism from supervisors; 2) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and 3) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness (R. 312-13).

On February 7, 2005, Plaintiff was examined by Dr. Gustin upon referral from Dr.

Omundsen. Plaintiff informed Dr. Gustin that her back "hurt[] across her low back down into [her buttocks] . . . and around into the thighs when she [got] real active." Plaintiff reported that when she "[brought] in wood to heat her home, that's when she [felt] most of the pain." Plaintiff denied any numbness or tingling in her feet. Dr. Gustin noted Plaintiff sat "comfortably." Her straight leg raising test was negative, bilaterally. She was "without a drop foot." Plaintiff had full range of motion of her hips, knees and ankles. Dr. Gustin noted that "X-rays were taken" and showed a "possible L5-S1 slip of about 20%. Difficult to see at this time." Dr. Gustin diagnosed lumbar back pain and bilateral back pain "at times." He instructed Plaintiff to continue medicating with Ibuprofen and Flexeril. Dr. Gustin informed Plaintiff that if she should "become more symptomatic," she should contact him to schedule a MRI of her lumbar spine (R. 324).

On February 16, 2005, Dr. Omundsen completed a West Virginia Department of Health and Human Resources General Physical (Adult) of Plaintiff. Dr. Omundsen noted Plaintiff was under her care for epilepsy, asthma, arthritis, chronic fatigue, and "CRM." Dr. Omundsen wrote that Plaintiff had been referred to her on February 4, 2005, by the D.H.H.R. of West Virginia. Dr. Omundsen opined Plaintiff's blood pressure was 102/82 and her weight was 183 pounds. Dr. Omundsen found Plaintiff was positive for nasal edema, "broken teeth," limited ROM of her neck, cervical lymphadenopathy of her lymphatic system, bilateral breast fibroid cysts, wheezes and restricted air movement of her lungs and chest, trace pedal edema, seizures, depression, chronic pain syndrome, ADHD, multiple osteoarthritis of knees, spondylolisthesis of back, and degenerative joint disease of her wrists and hands (R. 320). Dr. Omundsen described Plaintiff's pain as "sharp stabbing and chronic dull pain, daily pain scale 9/10" in her back, lumbar spine, wrists, hands, breasts, hip and knees. Dr. Omundsen noted her major diagnoses of Plaintiff included osteoarthritis, degenerative

joint disease, seizure disorder, depression, asthma, allergies, and chronic pain syndrome. Her minor diagnoses were for insomnia, ADHD, and dental (R. 321).

Dr. Omundsen opined Plaintiff could not work full time at a customary occupation due to "[m]ental dullness from medication, chronic pain limiting physical abilities, seizures." Dr. Omundsen opined she could not "think of job/occupation that could accommodate [Plaintiff's] multiple organ system problems." Dr. Omundsen found Plaintiff should avoid all work situations due to her "mental dullness from medications" which "raises severe safety issues. Cannot sit, stand etc [sic] for prolonged period of time." Dr. Omundsen opined Plaintiff could never work full time because she did not "anticipate any improvement in condition." Dr. Omundsen opined Plaintiff needed the following diagnostic testing: MRI for spondylolisthesis and spondylolysis of her back; a sleep study; an EEG to "reevaluate seizures." Dr. Omundsen opined Plaintiff required orthopedic, neurological, neurosurgery, and dental consultative treatment. Dr. Omundsen found Plaintiff needed pain management. Dr. Omundsen found Plaintiff "may need surgical intervention for back." Dr. Omundsen opined Plaintiff should not be referred for vocation rehabilitation (R. 321).

On May 20, 2005, Plaintiff presented to Dr. Omundsen with complaints of sinus congestion, cough and shortness of breath. Plaintiff complained of excessive daytime sleepiness and snoring and reported her "brother was just diagnosed with sleep apena" so Plaintiff completed a sleep questionnaire and "fell into the category of severe daytime sleepiness." Dr. Omundsen diagnosed asthmatic bronchitis, excessive daytime sleepiness, and seizure disorder. She prescribed Omnicef. Dr. Omundsen ordered a sleep study (R. 325).

Plaintiff's May 24, 2005, laboratory testing of her comprehensive metabolic profile showed normal results, except Plaintiff's blood urea nitrogen was low (R. 326). Plaintiff's CBC profile showed normal results (R. 327).

On June 22, 2005, Plaintiff underwent a polysomnogram for her complaint of excessive daytime somnolence. Dr. Crowe noted Plaintiff's reported symptoms were as follows: gasping and choking during sleep; restless sleep; excessive daytime sleepiness; frequent morning headaches; memory loss; restless/jerking legs; mood disorder; and her brother had been diagnosed with sleep apnea and reported snoring. Plaintiff's sleep efficiency was 74%; her "REM sleep was not recorded." Plaintiff had seventy-eight spontaneous arousals and "only 2 respiratory related arousals." Plaintiff had "48 periodic leg movements of sleep with arousal, 73 periodic leg movements without arousal . . . ." Two hypopneas were noted; therefore, Plaintiff's apnea/hypopnea index was normal. She had no oxygen desaturation. Dr. Crowe opined that, except for the "frequent spontaneous arousals, [Plaintiff's] . . . sleep architecture [was] unremarkable." Dr. Crowe opined that Plaintiff's "PLMA index of 9.7" and her "frequent spontaneous arousals" caused him to be "strongly suspicious for the clinical diagnosis of restless leg syndrome." He suggested Plaintiff medicate, for a trial period, with Dopaminergic or Klonopin (R. 328).

Administrative Hearing

At the June 8, 2006, administrative hearing, Plaintiff testified she had obtained her Associates of Arts degree from Shepherd College in the Spring of 2006. Plaintiff testified she last worked in 2001. She had worked "20 years" in "retail." Plaintiff's income at the time of the administrative hearing was inherited money from her mother, who had died the previous year (R. 356). Plaintiff reported having managed a clothing store for nine years, until the management chain went bankrupt and closed the store (R. 357).

Plaintiff testified she had never been hospitalized. She described the effects of her restless leg syndrome as feeling as if she had never rested when she got out of bed in the morning. Plaintiff

stated RLS wakes her forty-eight times per night (R. 358). Plaintiff testified that if she took three-hour college classes, she would fall asleep during them (R. 360). Plaintiff stated she took medicine to control her seizure disorder and her last seizure occurred in 1980 (R. 361). Plaintiff testified that she has twelve of the fifteen side effects that can be caused by the seizure medication: "constant headache, bloating, joint stiffness" were the ones she could remember (R. 361-62). Plaintiff testified she medicated her asthma with Servant, Maxair and one other medication, but did not use inhalers since she "put the air purifiers in the house." Plaintiff reported she did not "get . . . [asthma] attacks." She could not breathe. Her not being able to breathe was exacerbated by her smelling perfume (R. 362). Plaintiff stated she had "CRM arthritis," which affected the joints in her hands. She testified that "the thumb joints [were] disintegrating in both hands" and that Dr. Slope "wanted to replace both the joints in [her] hand," but she refused to have the surgery. Plaintiff testified that her arthritis caused her hands to go numb "within ten minutes of using [her] hands to do anything" (R. 363). Plaintiff stated she could not type on a computer or cut onions (R. 363-64). Any constant use of her hands caused numbness, Plaintiff stated. Plaintiff testified she experienced depression, that was caused "from the . . . pain." Plaintiff stated she hand never received any counseling or therapy for her depression. Plaintiff stated she did not take medication to treat her depression because that would be "just one more pill to take." Plaintiff testified the medication she took for her RLS caused her to vomit; she no longer took that medication (R. 364). Plaintiff testified that Dr. Omundsen recommended she undergo testing for her back because she had "a vertebrae in the lower part of [her] back that they want to replace." Plaintiff stated her chronic fatigue was caused by her RLS (R. 365). Plaintiff testified she had arthritis and torn ligaments in both knees, but she did not "entertain the thought" of surgery for those conditions (R. 365-66). Plaintiff stated she wore a back

brace when she had to lift anything. Plaintiff testified she had a chipped vertebrae in the center of her back from being thrown from a horse in the 1980's and a chipped vertebrae in her neck (R. 366).

Plaintiff testified that her greatest "problem [was] . . . the constant pain" in her hands, back, legs, knees, feet, neck. Plaintiff stated the "pain doesn't stop" (R. 366).

Plaintiff testified that she awoke at 6:00 a.m. to care for her two dogs. Plaintiff stated she scheduled her college classes for the afternoon (R. 359). Plaintiff testified she used to paint ceramics for six hours per day as a hobby; she could not do that activity because she did not "have the energy for it any more." Plaintiff reported she and a friend traveled to Tennessee the previous year for a vacation at Dollywood, through which she slept (R. 360).

The VE described Plaintiff's past work in retail sales and management as skilled occupations and light duty. When asked by the ALJ if she "place[d] any vocational significance in [Plaintiff's] attending and completing two years of college," the VE responded, "Oh, absolutely" (R. 368). The VE stated Plaintiff's attaining her A.A. degree "[told her] . . . that she has goals to return to work, as working toward those goals by getting the education that she needs. And she's acquiring additional skills while she does that" (R. 368-69). The ALJ then asked the VE the following question: "Assuming that accurately reflects [Plaintiff], if in and in addition thereto, she's able to lift ten pounds frequently and 20 pounds occasionally, what light type jobs would you suggest for such person?" The VE responded that Plaintiff's "prior retail sales work falls within that." The ALJ asked, "And I assume the incidence of those retail sales jobs are astronomical?" The VE responded, "Yes." Plaintiff's counsel then asked the VE to review Exhibit 6F (Dr. Omundsen's February 5, 2004, Physical Residual Functional Capacity Questionnaire (R. 256-59) and then asked, based on that evidence, if Plaintiff could "engage in substantial gainful activity at a competitive level" (R. 369.

The VE responded that the "document restricts [counsel's] . . . client to sedentary work.  But then gives significant limitations in terms of the use of her hands, fingers, and arms.  In my vocational opinion, that's incapable if one has sedentary work, one must be able to have good use of their [sic] hands, fingers and arms.  So my . . . answer would be based on this document I would have to say that it's less sedentary and there would be no work" (R. 370).

Evidence Submitted to Appeals Council

On August 22, 2006, Plaintiff presented to Dr. Omundsen with complaints of a knot in her left hand.  It was painful with repetitive motions, moving, gripping, and lifting.  Plaintiff reported memory "difficulties."  Plaintiff reported her condition had not improved or worsened.  She reported having no seizures.  Plaintiff was negative for anxiety, dizziness, headache, heartburn, insomnia, joint pain, suicidal thoughts, and/or wheezing.  Plaintiff was positive for constipation, depression, fatigue, shortness of breath, and sneezing.  Examination of Plaintiff's eyes, ears, nose, mouth, pharynx, neck, lungs, heart, breasts, abdomen were normal.  Plaintiff's neurological examination was normal.  Plaintiff was positive for extremity edema due to a 3mm ganglion cyst.  Dr. Omundsen diagnosed ganglion cyst, seizures, fatigue.  Plaintiff was instructed to continue taking her medications as prescribed; Dr. Omundsen opined there was no treatment needed for the ganglion  (R. 347).

On September 13, 2006, Plaintiff reported to Dr. Omundsen that she had "got[ten] denied for Disability because no current data from Dr. Swope or condition of hands."  Plaintiff reported her thumbs were "extremely painful, grinding."  She informed Dr. Omundsen her thumb pain was worse on rainy days.  Plaintiff stated Naprosyn caused chest pain, so she needed "something else for chronic & break through pain."  Plaintiff informed Dr. Omundsen she stopped taking Namenda "due to constipation," and Plaintiff reported "notic[ing] difference in clarity of thinking."  Her asthma was

stable; her chronic fatigue was still "an issue." Dr. Omundsen's examination of Plaintiff revealed fatigue, constipation, joint pain, myalgia, weakness, joint swelling, and depression. Dr. Omundsen found Plaintiff had "trouble lifting or doing repetitive motion." Dr. Omundsen noted Plaintiff was in acute distress as she was "tearful from news from court" and "financially challenged." Dr. Omundsen noted Plaintiff had "crepitance mc joints both hands" and that Plaintiff's speech was slow with "word searching." Dr. Omundsen diagnosed osteoarthritis and degenerative joint disease. She referred Plaintiff to Dr. Swope for re-evaluation. Dr. Omundsen provided Plaintiff samples of Celebrex. Plaintiff's GERD, seizures, and asthma were stable. Dr. Omundsen prescribed a lower dose of Namenda for Plaintiff's "mental illness" because a higher dose had caused constipation. Dr. Omundsen provided a copy of this medical record to Plaintiff's counsel (R. 346).

On September 27, 2006, Dr. Swope wrote to Plaintiff's lawyer, informing him that Plaintiff "had documented" carpal/metacarpal arthritis "involving the metacarpotrapezial joints of both thumbs since 2001." The use of her hands, "especially utilization of the thumb for heavy gripping and twisting motions such as opening jars" was impaired, according to Dr. Swope's letter (R. 349).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ Brown made the following findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

26

3. The claimant's musculoskeletal impairment and mental impairment are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity: light work.

7. The claimant's past relevant work as a retail sales/sales management did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR §§ 404.1565 and 416.965).

8. The claimant's medically determinable musculoskeletal impairment and mental impairment do not prevent the claimant from performing her past relevant work.

9. The claimant was not under a "disability" as defined in the Social Security Act, [sic] at any time through the date of the decision (20 CFR §§ 404.1520(f) and 416.920(f)) (R. 26).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (<u>quoting</u> *Consolidated Edison Co. v.*

*NLRB*, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)).   In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B.  Contentions of the Parties

The Plaintiff contends:

1.      . . . [T]he opinion of Dr. Omundsen should be given controlling weight in this case (Plaintiff's brief at p. 19; p. 17 of 21 [at Docket Entry 10-2].

2.      . . . [T]he Administrative Law Judge failed to evaluate the Plaintiff's complaints of pain and how that pain impacts on her residual functional capacity (Plaintiff's brief at p. 21; p. 18 of 21 [at Docket Entry 10-2]).

The Commissioner contends:

1.      Dr. Omundsen's assessments and opinions concerning Plaintiff's limitations are not supported by and are inconsistent with the medical evidence including the records of her own practice and essentially adopt and reflect Plaintiff's statements and complaints concerning her limitations (Defendant's brief at p. 14).

2.      Credibility determination as to a claimant's statements regarding her limitations are for the ALJ to make (Defendant's brief at p. 14).

28

## C. Weight to Treating Physician

Plaintiff alleges that the opinions of Plaintiff's treating physician should be given controlling weight. She asserts that the ALJ "totally disregarded the claimant's treating physician, Dr. Beth Omundsen [sic] who had been treating the Plaintiff since 1999 and is the only one who had a longitudinal relationship with the Plaintiff." Plaintiff supports this allegation by asserting that "the Administrative Law Judge chose to accept the opinions of various DDS medical consultants and non-examining consultants regarding the Claimant's functional restrictions . . ." and the ALJ "failed to articulate any reason, rationale or basis for completely rejecting the Residual Functional Capacity Assessment submitted by the Plaintiff's primary treating physician, Dr. Beth Omundsen." Plaintiff contends that Dr. Omundsen's opinions should be given controlling weight (Plaintiff's brief at pp. 18-19; pp. 16-17 of 21 [Docket Entry 10-2]). Defendant contends that Dr. Omundsen's assessments and opinions are not supported by and are inconsistent with the evidence of record, which include Dr. Omundsen's own records, and Plaintiff's treating physician based her opinions on Plaintiff's statements (Defendant's brief at p. 14).

In his decision, the ALJ found the following as to the opinion of Dr. Omundsen:

> The undersigned is aware that at Exhibit 6F, Dr. Omudnsen [sic] opined that the claimant was limited to less than the full range of sedentary work. Opinions of treating physicians are given great weight when supported by the objective medical evidence and are consistent with other substantial evidence of record. However, this is not the case with regard to Dr. Omundnsen [sic] opinion (R 24).

Plaintiff asserts that the ALJ was "required to undertake a four-step analysis," as mandated by SSR 96-2p (Plaintiff's brief at p. 19; p. 17 of 21 [Docket Entry 10-2]). SSR 96-2p holds, in part, the following:

<u>Controlling weight</u>. This is the term used in 20 CFR 404.1527(d)(2) and 416.927(d)(2) to describe the weight we give to a medical opinion from a treating source that must be adopted. The rule on controlling weight applies when all of the following are present:

1.  The opinion must come from a "treating source," as defined in 20 CFR 404.1502 and 416.902. Although opinions from other acceptable medical sources may be entitled to great weight, and may even be entitled to more weight than a treating source's opinion in appropriate circumstances, opinions from sources other than treating sources can never be entitled to "controlling weight."

2.  The opinion must be a "medical opinion." Under 20 CFR 404.1527(a) and 416.927(a), "medical opinions" are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight. (See <u>SSR 96-5p</u>, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner.")

3.  The adjudicator must find that the treating source's medical opinion is "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques. The adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion.

4.  Even if well-supported by medically acceptable clinical and laboratory diagnostic techniques, the treating source's medical opinion also must be "not inconsistent" with the other "substantial evidence" in the individual's case record.

If any of the above factors is not satisfied, a treating source's opinion cannot be entitled to controlling weight. It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record. However, when all of the factors are satisfied, the adjudicator must adopt a treating source's medical opinion irrespective of any finding he or she would have made in the absence of the medical opinion.

Dr. Omundsen was a treating source. Plaintiff was treated by her at the Amherst Family Practice from June, 2003, through September, 2006. The evidence contains five records of examinations conducted by Dr. Omundsen of Plaintiff and two reports as to Plaintiff's limitations and abilities. Dr. Omundsen's opinions were medical opinions in which she expressed findings as to the nature and severity of Plaintiff's impairments. The ALJ did not take exception to these facts (R. 20-25).

The ALJ found Dr. Omundsen's opinions as to Plaintiff's limitations were not "well supported" by objective medical evidence and were inconsistent with the other evidence of record. The ALJ noted the following opinion of Dr. Omundsen:

> Physical residual functional capacity questionnaire completed by Dr. Omundnsen [sic] noted that the claimant could sit for 15 minutes at one time and stand for 15 minutes at one time. She can sit [sic] stand/walk about 2 hours in an 8 hour workday. She needs a job that permits shifting positions at will from sitting, standing or walking. She needs to take unscheduled breaks during an 8 hour working day at least 2 to 3 times for 5-10 minutes. She needs to elevate her legs with prolonged sitting. She can lift/carry 10 pounds occasionally. She can never climb ladders and she has significant limitations in doing repetitive reaching, handling or fingering. Dr. Omundsen opined that the claimant was likely to be absent from work as a result of her impairments or treatment more than four days per month (Exhibit 6F) (R. 21-21).

The ALJ noted the clinical and laboratory diagnostic techniques, as found in the record, did not support this finding by Dr. Omundsen. He specifically considered and analyzed the following:

- Dr. Kerbyson's finding that Plaintiff's muscle strength and tone in all extremities were normal; she could stand on one leg at a time without difficulty; she could make a fist, bilaterally, write her name, button, and pick up coins; she could walk on her heels and toes; she could perform tandem gait; she could squat without difficulty; and she had normal straight leg raising test, bilaterally (R. 20);

- The pulmonary function report that showed Plaintiff was negative for obstructive apnea, but the "study was strongly suspicious for the clinical

diagnosis of restless leg syndrome" (R. 22);

- The x-ray, taken by Dr. Gustin, which showed "possible L5-S1 slip of about 20 percent" and the results of the straight leg raising test and range of motion testing, all of which were normal (R. 22).

In making her finding, Dr. Omundsen noted that the clinical findings and objective signs on which she relied were "swelling/pain" in "joints in hands, wrists. [T]enderness, hip tenderness. Seizure medicine contributing to fatigue. Asthma/wheezing contribute to low endurance" (R. 256). These are not clinical or laboratory findings. Dr. Omundsen did not rely on any testing of physical ability, any x-ray or MRI scan, or any pulmonary testing.

The ALJ also made a determination that Dr. Omundsen's opinions were not consistent with the other evidence of record. Specifically, the ALJ found Dr. Omundsen's opinions were inconsistent with the opinions of consultative/examining physicians. Dr. Kerbyson found Plaintiff was comfortable sitting and in the supine position. He found she was stable at station; had no shoulder, elbow or wrist tenderness; had no redness, warmth, swelling; had no hand tenderness, except for the "right thumb at the MCC joint where the clamant [sic] complained of marked tenderness"; no atrophy; no leg tenderness; no cervical spine tenderness; normal spinal curvature; no paravetebral muscle spasm; no dorsolumbar spinous tenderness to percussion; and no hip joint tenderness, redness, warmth, or swelling. Dr. Kerbyson diagnosed moderate obesity, osteoarthritis of the right wrist, history of seizure disorder, history of asthma, and history of depression (R. 20, 24). The ALJ also noted the inconsistency between the opinion of Dr. Omundsen and that of Dr. Gustin. After examining Plaintiff in February, 2005, Dr. Gustin found Plaintiff had, at times, lumbar back pain and bilateral leg pain (R. 22).

The ALJ also considered the inconsistency of Dr. Omundsen's opinion to those of the state-agency physicians. He considered and analyzed the following:

- September 10, 2003, finding by Mr. Roman that Plaintiff had no restrictions of activities of daily living (R. 20);

- October 14, 2003, opinion by Dr. Franyutti that Plaintiff had no exertional limitations, but she could never climb a ladder, rope or scaffold (R. 20);

- April 13, 2004, opinion by Dr. Franyutti that Plaintiff had no exertional limitations, but she could never climb a ladder, rope or scaffold (R. 21);

- April 19, 2004, opinion of Mr. Kuznair that Plaintiff had no restrictions of activities of daily living (R. 21);

- July 13, 2004, opinion of Dr. Lauderman that Plaintiff could lift/carry fifty pounds occasionally, lift twenty-five pounds frequently, stand/walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday (R. 21);

- August 23, 2004, opinion of Mr. Roman that Plaintiff had mild restrictions of activities of daily living (R. 21).

The Appeals Council considered the opinion of Dr. Swope, who, on September 27, 2006, opined that Plaintiff's use of her hands was impaired in that she experienced difficulty using her "thumb for heavy gripping and twisting motions such as opening jars" (R. 349).

In addition to Dr. Omundsen's opinions being inconsistent to the opinions of examining/consultative physicians and state-agency physicians, the ALJ noted the opinions were also inconsistent to statements made by Plaintiff. On February 7, 2005, Plaintiff told Dr. Gustin that she carried wood into her home. Plaintiff testified she drove a car and she had completed her A.A. degree a few months prior to the administrative hearing (R. 24, 25).

Finally, the ALJ considered the inconsistencies found in Dr. Omundsen's own opinions. He noted that Dr. Omundsen's examination of Plaintiff, on June 16, 2003, showed no swelling or deformity of her back and her sensation was intact (R. 22). Also, during that examination, the record contains Dr. Omundsen's findings that her straight leg raising rest was normal and her distal pulses were strong. There were some spasm and tenderness at the lumbar area of the spine and in the MP joints of her hand (R. 316). Dr. Omundsen's examination of Plaintiff on January 2, 2004, revealed only some tenderness in her hips and MP joint of her left thumb (R. 22). The Appeals Council examined the evidence, from Dr. Omundsen's August 22, 2006, office notes, in which she opined that Plaintiff was negative for dizziness, headache, insomnia, joint pain and wheezing. Her neurological examination on that date was normal (R. 347).

Based on the above analysis, the undersigned finds that substantial evidence supports the ALJ's decision that Dr. Omundsen's opinion was not well supported by objective medical evidence and was inconsistent with the opinions of the examining/consulting physicians, clinical and laboratory testing, state-agency physicians, Plaintiff's statements, and Dr. Omundsen's own findings upon examination. Dr. Omundsen's opinions, therefore, are not entitled to controlling weight.

Plaintiff argues that the ALJ's decision "fails . . . to articulate whether or not the Administrative Law Judge engaged in any analysis of the treating sources' [sic] medical opinions considering the factors as set forth in 20 C.F. R. 404.1527.

20 C.F.R. §404.1527 reads, in part, as follows:

(d) *How we weigh medical opinions*. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.</u> When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (I) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

> (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

As noted above, the ALJ analyzed the examining relationship and the treatment relationship of Dr. Omundsen to Plaintiff. He noted that Plaintiff had been in Dr. Omundsen's care from June, 2003, through June, 2006. He considered that Plaintiff was treated by Dr. Omundsen for chronic pain, chronic arthritis, seizure disorder, joint tenderness, sleepiness, and depression, even though Dr. Omundsen was not a specialist in those fields (R. 20-22, 316). The ALJ considered whether Dr. Omundsen's opinions were supported by the medical signs and laboratory findings; he determined that they were not (*See* p. 27 above). The ALJ analyzed the consistency of Dr. Omundsen's opinion to the record as a whole, and he found it to be inconsistent with the opinions/findings of the examining/consultative physicians, state-agency physicians, Plaintiff's statements, and her own records (*See* pp. 27-29 above). Based on the above, the undersigned finds the ALJ completed an adequate analysis of the opinions of Dr. Omundsen as required by 20 C.F.R. 404.1527(d).

The ALJ's decision to not assign great weight to the opinion of Dr. Omundsen because that opinion was not supported by objective medical evidence and was inconsistent with the evidence of record is supported by substantial evidence.

## D. Credibility

Plaintiff asserts that the ALJ failed to evaluate Plaintiff's complaints of pain and how that pain impacted her residual functional capacity. The Plaintiff alleges that the ALJ failed to articulate and analyze those complaints of pain as set forth in the guidelines provided under 20 C.F.R.

404.1529 and SSR 96-7p (Plaintiff's brief at p. 21; p. 18 of 21 [at Docket Entry 10-02]). The Defendant asserts that credibility determination as to a claimant's statements regarding her limitations are for the ALJ to make.

Plaintiff argues that the ALJ "should evaluate the intensity and persistence of the pain and the extent of the limitations on the Plaintiff's ability to work," as mandated by the Fourth Circuit in *Craig v. Chater*, 76 F.3d 585, 595 (1996).

In *Craig*, *id.*, the Fourth Circuit mandated the following protocol relative to the consideration and analysis of an individual's complaints of pain:

> 1)   For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

The ALJ in the instant case made the following finding: ". . . [T]he claimant has medically

determinable impairments, which could reasonably be expected to produce some of the symptoms alleged due to her impairments" (R. 24). The undersigned finds the ALJ fully complied with the first threshold step in *Craig, supra*; therefore, the ALJ was required to evaluate Plaintiff's complaints of pain in conformance with step two. In conducting step two of the analysis, the ALJ found the following:

> Based on a review of all the evidence, the Administrative Law Judge finds the claimant's statements concerning her impairments and their impact on her ability to work were not entirely credible, in light of the reports of the examining practitioners. . . . [T]he claimant's allegations regarding the intensity, persistence and functional limitations of her symptoms are unsupported by the objective medical evidence of record. Indeed the evidence shows that the claimant suffers from pain; however, the evidence shows that she is still able to move about, use her arms, hands and legs in a satisfactory manner . . . (R. 24).

20 C.F.R. 404.1529 specifically lists the criteria, as does *Craig, supra*, that must be considered by the ALJ in assessing Plaintiff's credibility. 20 C.F.R. 404.1529 reads as follows:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. By objective medical evidence we mean medical signs and laboratory findings as defined in §404.1528(b) and (c). By other evidence, we mean the kinds of evidence described in §§404.1512(b)(2) through (6) and 404.1513(b)(1), (4), and (5) and (e). These include statements or reports from your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work. However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or the symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.

Additionally, SSR 96-7p mandates, in part, the following:

It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

A review of the ALJ's decision finds he complied with the mandates contained in the credibility analysis of *Craig*, *supra*, and the criteria listed in 20 C.F.R. 404.1529. Specifically, the ALJ considered and evaluated Plaintiff's medical history, laboratory findings, objective medical evidence of pain, activities of daily living, medical treatment used to alleviate pain, and Plaintiff's statements. His decision thereon is supported by the evidence of record. Additionally, the ALJ's decision contained "specific reasons for the finding on credibility," as required in SSR 96-7p.

The ALJ considered Plaintiff's medical history. He discussed the consultative mental examination conduced by Mr. Hood, the consultative evaluation performed by Dr. Kerbyson, her complaints and treatment therefor by Dr. Omundsen, the examination by Dr. Gustin, her history of seizures, and her history of depression symptoms (R. 20-25).

The ALJ considered the laboratory findings as to Plaintiff's conditions, which support the ALJ's opinion. The ALJ assessed the x-ray taken during the examination by Dr. Gustin, which showed a "possible L5-S1 slip of about 20 percent." The ALJ also considered the polysomnogram that Plaintiff completed on June 22, 2005, which showed no evidence of obstructive apnea but was "strongly suspicious for the clinical diagnosis of restless leg syndrome" (R. 20, 22). The ALJ found there was "no evidence of acute bony abnormality from radiological studies" when evaluating the laboratory findings (R. 23).

The ALJ also considered the medical treatment used by Plaintiff to alleviate her pain. He noted that Plaintiff's use of Tegretol controlled her seizure disorder (R. 22). He also noted that Plaintiff testified that she "had side effects from her medication" (R. 24). The ALJ considered that Plaintiff "suffer[ed] from depression, but she does not have any treatment for the depression, no [sic] does she take medication for the depression" (R. 25).

The ALJ considered the objective medical evidence relative to Plaintiff's pain as it related to her depression, and that medical evidence supports his opinion as to Plaintiff's complaints were "unsupported by the objective medial evidence" (R. 24). The ALJ evaluated Mr. Hood's September 6, 2003, opinion that Plaintiff's "stream of thought was well organized, there was no evidence of delusions, phobias or obsessions. Illusions or hallucinations were not present. Her immediate memory, remote memory, concentration, psychomotor behavior, persistence and pace were within normal limits" (R. 21). The ALJ considered the Mental Residual Functional Capacity Assessment completed on April 19, 2004, in which Mr. Kuznair, a state-agency physician, found Plaintiff was "moderately limited in her ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual withing customary tolerances . . . complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." The ALJ also considered Mr. Kuznair's opinion, found in a Psychiatric Review Technique, which he also completed on Plaintiff on April 19, 2004, that Plaintiff had "no restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace." The ALJ evaluated Mr. Roman's August 23, 2004, Psychiatric Review Technique, in which he opined that Plaintiff had "mild

40

restrictions of activities of daily living, moderate difficulties in maintaining social functioning, [and] mild difficulties in maintaining concentration, persistence or pace." The ALJ also evaluated Mr. Roman's opinion, expressed in his August 23, 2004, Mental Residual Functional Capacity Assessment, that Plaintiff "was moderately limited in her ability to carrryout [sic] detailed instructions, maintain attention and concentration for extended periods and perform activities withing a schedule, maintain regular attendance and be punctual within customary tolerances and she was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" (R. 21). Based on his analysis of the objective medical evidence as to Plaintiff's depression, the ALJ found that Plaintiff had no marked limitations in her activities of daily living, social functioning,, or concentration, persistence or pace (R. 23). The ALJ also opined that, "although the claimant suffers from mental problems, she is still able to take care of her own personal needs, think, communicate and act in her own interest" (R. 25). Indeed, the ALJ noted that Plaintiff had just completed her college degree, dined in restaurants, went to the movies, drove a car, and got "along with most people" (R. 24, 25). His finding as to Plaintiff's limitations caused by her depression are supported by substantial evidence.

In addition to analyzing and considering the objective medical evidence relative to Plaintiff's depression, the ALJ also evaluated the objective medical evidence of record as to Plaintiff's pain as it related to her physical conditions. The ALJ reviewed and evaluated the September 30, 2003, consultative examination report by Dr. Kerbyson. He noted that Dr. Kerbyson found Plaintiff's gait was normal, "which was not unsteady, lurching or unpredictable"; Plaintiff was stable at station; she did not require the use of assistive devices; she was comfortable in the supine and sitting positions;

she had no tenderness, redness, warmth, or swelling in any joint, muscle, or extremity, except for tenderness in the "right thumb at the MCC joint where the clamant [sic] complained of marked tenderness"; Plaintiff had no atrophy; she had no manipulation limitations; her cervical and dorsolumbar spines were normal; Plaintiff had no muscle spasm; she had normal straight leg raising test, muscle strength and tone; and she was able to stand on one leg at a time without difficulty, walk on her heels and toes "perform tandem gait and squat without difficulty." The ALJ considered Dr. Kerbyson's diagnosis, which was for "moderate obesity, osteoarthritis of the right wrist, status post multiple surgeries, history of seizure disorder, history of asthma and history of depression" (R. 20).

The ALJ reviewed the objective medical evidence provided by Dr. Lauderman, a state agency physician, who found, on July 13, 2004, that Plaintiff could occasionally lift/carry fifty pounds, frequently lift/carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday (R. 21). He considered Dr. Franyutti's October 14, 2003, and April 13, 2004, opinions that Plaintiff had no exertional limitations, except that she could never climb ladders, ropes or scaffolds (R. 20, 21).

The ALJ also considered Dr. Gustin's opinion that Plaintiff's x-ray showed that she had "possible L5-S1 slip of about 20 percent" but that, during his examination of Plaintiff, she sat comfortably and had full range of motion in her hips, knees, and ankles. Dr. Gustin found Plaintiff had a negative straight leg raising test, bilaterally, and "was without drop foot." The ALJ considered Dr. Gustin's diagnosis, which was for "lumbar back pain and bilateral leg pain at times" (R. 22).

The ALJ considered the opinion of Dr. Crowe, who interpreted the results of Plaintiff's polysomnogram report, which was dated June 22, 2005. The ALJ noted Dr. Crowe found the "study was strongly suspicious for the clinical diagnosis of restless leg syndrome," but she did not have obstructive apnea (R. 22).

The ALJ carefully considered the objective medical evidence of record provided by Dr. Omundsen. In office notes, Dr. Omundsen wrote that Plaintiff was "pursuing disability because of her seizures [sic] asthma, chronic arthritis and chronic pain" (R. 21-22). On June 16, 2003, Dr. Omundsen found Plaintiff had "no visible swelling or deformity of her back"; her sensation was intact; but she had "tenderness at the MP joints of her hands particularly at the thumb." On January 2, 2004, Dr. Omundsen found Plaintiff had "tenderness particularly of the MP joint of her left thumb" and "some tenderness in her hips." The ALJ also considered Dr. Omundsen's physical RFC of Plaintiff, which was completed on February 5, 2004, and which he found to be inconsistent with the other evidence of record, in which Dr. Omundsen opined Plaintiff was limited to sitting and standing for fifteen minutes at a time; needed to shift positions; needed to take unscheduled breaks; needed to elevate her legs; could occasionally lift/carry ten pounds; could never climb ladders; had significant limitations in doing repetitive reaching, handling or fingering; and would be absent from work for more than four days per month (R. 20-21, 24). The ALJ considered Dr. Omundsen's June 14, 2006, findings that Plaintiff had "not had any further seizure episodes" and that she had "residual tenderness over the right zygomatic arch and a tender anterior cervical adenopathy" (R. 22).

Based on the ALJ's analysis of the objective medical evidence of record as to Plaintiff's physical conditions, he concluded that Plaintiff had no "acute bony abnormality from radiological studies or of failed staged surgery with a resultant loss of major function in an extremity, nor is there evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis . . . ." The ALJ found that Plaintiff's seizure disorder was not severe because Dr. Omundsen had found that Plaintiff was seizure free on June 14, 2006, and that Plaintiff had reported that she had been seizure free since 1980 (R. 23). Additionally, the ALJ found the following:

43

During her consultative examination it was noted that the claimant ambulated with a normal gait, she did not require a handheld assistive device. Her shoulders, elbows and wrists were not tender. Her hands revealed no tenderness, that [sic] was no atrophy and she was able to make a fist bilaterally. She was able to write her name, button and pick up coins with either hand without difficulty. Examination of the legs revealed no tenderness, examination of the cervical spine revealed no tenderness. There was no evidence of paravertebral muscle spasms. Straight leg raise test in the sitting and supine position [sic] was normal. Muscle strength and tone were normal at 5/5 bilaterally in the upper and lower extremities. There was no evidence of atrophy, the claimant walked on her heels and toes and she was able to perform tandem gait and squat without difficulty (R. 24).

In analyzing Plaintiff's complaints of pain, the ALJ considered her activities of daily living. The ALJ noted that Plaintiff, at the administrative hearing, testified that she had a driver's license and had completed her A.A. degree "in fashion merchandising in the spring of this year"(R. 24-25). Additionally, at the administrative hearing, Plaintiff testified that she awoke at 6:00 a.m. to care for her two dogs (R. 359). Plaintiff testified she used to paint ceramics for six hours per day as a hobby; she could not do that activity because she did not "have the energy for it any more." Plaintiff reported she and a friend traveled to Tennessee the previous year for a vacation at Dollywood, through which she slept (R. 360). The ALJ considered the activities of daily living that Plaintiff stated she could perform in conjunction with the record of evidence; the evidence supports his finding that Plaintiff was not entirely credible. The ALJ considered that Plaintiff told Mr. Hood, on September 6, 2003, that she occasionally attended church, had friends, and got along with most people. Plaintiff informed Mr. Hood that she enjoyed eating out in restaurants and going to the movies (R. 20, 25). The ALJ also considered that Plaintiff was found to have no restrictions of activities of daily living on September 10, 2003, by Mr. Roman; no restrictions of activities of daily living on April 19, 2004, by Dr. Kuznair; and mild restrictions of activities of daily living by Mr. Roman on August 23, 2004 (R. 20, 21). The ALJ considered, in addition to Plaintiff's having

completed her college degree and maintained a driver's license, that Plaintiff, on February 7, 2005, informed Dr. Gustin that she carried wood into her house to burn for heat (R. 22). The ALJ noted that Plaintiff was able to care for her own personal needs (R. 25). In the Activities of Daily Living form completed by Plaintiff on February 29, 2004, Plaintiff wrote she did not require assistance with washing, bathing, dressing or shaving. She reported she "tried to tackle" the laundry, vacuuming, paying bills, washing dishes, managing her bank account, running errands, taking out the trash, and washing the car "all [at] one time" if she "[kept] forgetting to do" them (R. 166). Plaintiff reported she spent two hours per week shopping and that she read magazines and newspapers and listened to the radio daily (R. 167).

In his decision, the ALJ also considered Plaintiff's statements relative to her complaints of pain. The undersigned finds that Plaintiff's statements were not always consistent with the record of evidence. The ALJ noted that Plaintiff reported to Dr. Omundsen on June 16, 2003, that she experienced severe pain and was depressed due to that pain; however, Dr. Omundsen's examination of Plaintiff on that date revealed that she had no swelling or deformity in her back. Her sensation was intact and her only tenderness was in her "MP joints of her hands particularly at the thumb. On January 2, 2004, Plaintiff reported "a lot of pain in her hips and legs" to Dr. Omundsen, but, on examination, Dr. Omundsen found "some tenderness in her hips." On February 7, 2005, Plaintiff reported to Dr. Gustin that she experienced chronic low back pain that "hurt[] across her low back down into the [buttocks] and around into the thighs when she [got] real active," as "when [she brought] . . . wood [into the house] to heat her home . . . ." Dr. Gustin's examination revealed, however, that Plaintiff sat comfortably, had negative bilateral straight leg raising test, was without drop foot, and she had full range of motion of her hips, knees and ankles. Plaintiff complained of

excessive sleepiness to Dr. Omundsen on May 20, 2005; Dr. Crowe opined that, after Plaintiff

completed a June 22, 2005, polysomnogram, she did not have obstructive apnea but was "strongly

suspicious for the clinical diagnosis of restless leg syndrome," for which, according to the record of

evidence, Plaintiff did not seek treatment (R. 22).

The degree to which the individual's statements are consistent with the medical signs and

laboratory findings and other information provided  medical sources, including information about

the medical history and treatment, are important in the evaluation of credibility, as is the consistency

of the individual's own statements. *See* SSR 96-7p.

"Because he had the opportunity to observe the demeanor and to determine the credibility

of the claimant, the ALJ's observations concerning these questions are to be given great weight."

*Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Finally, the ALJ did provide specific reasons for his finding on credibility, and those reasons

were supported by the case record.  In his decision, the ALJ found that Plaintiff's "allegations

regarding the intensity, persistence and functional limitations of her symptoms are unsupported by

the objective medical evidence of record." He found that the evidence showed Plaintiff could "move

about, use her arms, hands and legs in a satisfactory manner," and this finding was supported by the

opinion of Dr. Kerbyson, who found her gait was normal; she needed no handheld assistive devices;

she had no atrophy; she could make a fist, write her name, button, and pick up coins bilaterally; her

straight leg raising test was normal, bilaterally in both sitting and supine positions; she had no leg

or cervical spine tenderness; her muscle strength and tone were normal in all extremities; she had

no paravertebral muscle spasms; she could walk on her heels and toes; she could perform tandem

gait; and she could squat without difficulty (R. 24).  He concluded that Plaintiff's allegations were

not supported by Dr. Gustin's opinion that Plaintiff could sit comfortably, had negative straight leg raising test, bilaterally, and had a full range of motion of her hips, knees and ankles (R. 22). The ALJ specifically referred to the Physical Residual Functional Capacity Assessments, Psychiatric Review Techniques, and Mental Residual Functional Capacity Assessments completed by the state-agency physicians and the conclusions found therein (R. 20-22). The ALJ also relied on, referred to, and analyzed the opinions of Plaintiff's treating physician, Dr. Omundsen, that Plaintiff's sensation was intact, her straight leg raising test was normal, she had no swelling or deformity, she had some tenderness at the "MP joints of her hands particularly at the thumb," and she had some tenderness in her hips (R. 21-22).

For all of the above stated reasons, the undersigned finds that the ALJ's assessment of Plaintiff's credibility regarding her pain and his analysis of Plaintiff's statements about the intensity, persistence and limiting effects of her symptoms are supported by substantial evidence and that the ALJ specifically and thoroughly discussed her findings thereof. The ALJ's decision is supported by substantial evidence.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED**.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy

of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _28_ day of _May_____, 2009.

_____
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE